# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| In re: | |
| GERARD RENE ADAM, II, | Case No.   07-12268-RGM (Chapter 7) |
| Debtor. | |
| BRANCH BANKING & TRUST COMPANY, | |
| Plaintiff, | |
| vs. | Adv. Proc. No. 07-1170 |
| GERARD RENE ADAM, II, | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

Branch Banking & Trust Company made three loans to two entities owned by Gerard Rene Adam, II, and guaranteed by him.  The bank seeks to have the debtor's guarantees determined to be nondischargeable because he provided false personal financial statements to obtain the loans or he willfully and maliciously injured the bank.  11 U.S.C. §523(a)(2)(B) and (a)(6).  The debtor admits that the financial statements were false, but asserts that he did not publish them with the intent to deceive and that the bank did not reasonably rely on them.  The court finds that the loan guarantees are dischargeable.  While the debtor gave the financial statements to the bank with the intent to deceive it, the bank did not reasonably rely on them.

1

**Legal Standard**

<u>False Financial Statements, Section 523(a)(2)(B).</u>  Section 523(a)(2)(B) states:

(a)      A discharge under section 727 .   .   . of this title does not discharge an individual debtor from any debt –   .   .   .

       (2)      for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –   .   .   .

             (B)      use of a statement in writing –

                   (i)      that is materially false;

                   (ii)      respecting the debtor's or an insider's financial condition;

                   (iii)      on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

                   (iv)      that the debtor caused to be made or published with intent to deceive

The debtor admits all of the requisite elements except he denies that he intended to deceive the bank and that the bank reasonably relied on the financial statements.  *See Foley & Lardner (In re Biondo),* 180 F.3d 126, 134 (4ᵗʰ Cir. 1999) (discussing 11 U.S.C. §523(a)(2)(A)).

Intent to deceive can rarely be shown directly and generally must be shown from the circumstances surrounding the transactions.  Courts generally look to the "totality of circumstances surrounding the debtor's acts, including the debtor's knowledge of or reckless disregard for the accuracy of his financial statements."  *Consol. Bank & Trust Co. v. Dalton (In re Dalton)*, 205 F.3d 1332 (4ᵗʰ Cir. 2000) (unpublished opinion) (citing *Ins. Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1119 (3ʳᵈ Cir. 1995)).

The bank must show its reasonable reliance.  11 U.S.C. §523(a)(2)(B)(iii).

To establish reasonable reliance upon a false financial statement, a creditor must prove that reliance was objectively reasonable, and that there was actual reliance. *See In re Wingo,* 112 B.R. 141 (W.D.Va.1990). .   .   . [R]easonable reliance is to be objectively determined by the fact finder given the totality of the circumstances. *In re Figge,* 94 B.R. 654, 665 (Bankr.C.D.Cal.1988).  Reliance will be found to be reasonable if it is demonstrated by the creditor that had the false representation or omission been known, the credit would not have been extended. *In re Carr,* 49 B.R. 208, 210 (Bankr.W.D.Ky.1985).  In cases of lending institutions

2

> this standard is expanded to compare the creditors' actual conduct with debtor; the industry-wide practice; and the surrounding circumstances of the case. *In re Compton,* 97 B.R. 970, 979 (Bankr.N.D.Ind.1989); *In re Pascucci,* 90 B.R. 438, 446-447 (Bankr.C.D.Cal.1988). Finally, where a creditor is on notice of the statement's inaccuracy, its reliance on that statement is unreasonable. A creditor cannot ignore "red flags" and expect to benefit from nondischargeability. *Teates v. Kuranda (In re Kuranda),* 122 B.R. 264, 269 (Bankr.E.D.Va.1990).

*I.H. Mississippi Valley Credit Union v. O'Connor (In re O'Connor)*, 149 B.R. 802, 809-810 (Bankr.E.D.Va. 1993).

Lenders must follow reasonable industry practices but are otherwise under no duty to verify the accuracy of every entry in a financial statement regular on its face. "The question is one of objective reasonableness, taking into account all the circumstances." *Mester v. Brevard (In re Brevard)*, 200 B.R. 836, 846 (Bankr.E.D.Va. 1996) (rejecting the necessity of a face-to-face meeting to reconcile every "trifling discrepancy" between the financial statement and information the creditor already knew); *Riggs Nat'l Bank of Washington, D.C. v. Ross (In re Ross)*, 180 B.R. 121, 129 (Bankr.E.D.Va. 1994) (bank not under duty to "ferret out" misstatements). However, a creditor may not ignore information that casts doubt on a financial statement or information that is questionable on its face. These are red flags that must be resolved. *In re Kuranda,* 122 B.R. 264, 269 (Bankr.E.D.Va. 1990).

The creditor has the burden of proving the elements by the preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

Wilful and Malicious Injury, Section 523(a)(6). A debtor may also be denied a discharge of a debt if he willfully and maliciously injured another entity or the property of another entity. The injury, not just the act, must be intended. *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed. 2d 90 (1998).

### The Transactions

This case involves two transactions evidenced by three notes.  The first transaction was with Adam Family Enterprises, Inc., a company solely owned by the debtor.[1]  The initial loan was a construction loan with a maximum principal amount of $3.6 million.  It was made on July 21, 2005.  The loan was restructured on March 21, 2006.  The restructure limited the initial loan to $2,010,730 and created a new second loan of $900,000.  The debtor was the sole guarantor of the loans.  The second transaction was a $950,000 loan made to Fitness Quest, LLC, on January 26, 2006.  The debtor was  an owner of the business and sole guarantor of the loan.

Adam Family Enterprises Loans.  Adam Family Enterprises, a real estate development company solely owned by the debtor,  was building two houses and developing a small duplex community at Deep Creek Lake resort in Maryland.  The company wanted to refinance an existing $2 million loan from First United Bank & Trust.   Gerard Rene Adam, II, the debtor, first met with Joseph Clodfelter and Patrick Martin, two bank loan officers, at the Deep Creek project on May 25, 2005.  Both officers reported it was a good meeting and were optimistic that a banking relationship with the debtor could be developed.

Clodfelter, the loan officer who handled the account, called the debtor on May 31, 2005, and requested, among other things, a personal financial statement.  The debtor provided his financial statement dated May 31, 2005, the following day.  On June 3, 2005, Clodfelter called the debtor and asked for account statements for his brokerage accounts.  The debtor promptly provided them.

---

[1]Adam Family Enterprises, Inc., filed a chapter 7 petition in bankruptcy in this court on August 22, 2007, the same day that the debtor filed his petition.  Case No. 07-12269-RGM.

4

(Exhibit C).[2]  On June 9, 2005, the bank issued a commitment letter offering to loan Adam Family Enterprises up to $3.6 million to be used to refinance the land acquisition loan and to construct ten duplexes (20 saleable  units) in Cedar Creek Condominium at Deep Creek Lake.  The loan was to be repaid with monthly interest-only payments and unit releases payments at settlement on the sale of each unit.  The release fee was the greater of $225,000 or  75 percent of the sales price of the unit sold.  The loan was due in full on July 8, 2008.  The debtor was to be the sole guarantor.  The loan closed on July 21, 2005.  The debtor signed an unlimited guarantee of the obligation.

The bank became aware of difficulties with the project the following winter.  A contractor contacted the bank and asked when the bank would be releasing construction draws.  The bank had already released construction draws to the borrower and was surprised to find that the contractor had not been paid.  The debtor testified that the contractor had not completed his work and was not entitled to a draw.  The issue of whether the contractor was entitled to payment was not pursued at trial nor is it necessary to resolve for the purposes of this case.  It was, however, according to Clodfelter, the catalyst for restructuring the loan.[3]  On February 14, 2006, the bank issued a commitment letter which essentially restructured the original loan.  The original $3.6 million loan was converted into two  separate loans with additional collateral.  The initial $3.6 million loan was modified by capping it at $2,010,730 and a second loan with a cap of $900,000 was extended to

---

[2]Exhibit C, one of the debtor's exhibits, is pages 2 though 6 of the debtor's fax to the bank on June 7, 2005. It consists of the first pages of five statements:  MML Investors Services, Inc., as of April 30, 2005; SmithBarney as of February 27, 2005; Chevy Chase Financial Services as of April 30, 2005; Bessemer Trust (MJ Adam Rev Tr, Account 8G4783) as of April 30, 2005; and Bessemer Trust (GR Adam Rev Tr, Account 8G4782) as of April 30, 2005.

[3]Clodfelter elaborated on the reasons for the restructure in his February 1, 2006 Credit Memo to Rob Bowlby, also a bank officer.  He stated that two problems "put this project in a cash flow bind."  The first was that the old lender, First United, "required much more than was in the budget for the release of the property.  This used up money that was marked for interest carry and infrastructure."  The second was that the delivery of the first unit was delayed from December 2005 to February 2006.  As a result, some of the prospective purchasers "backed out from purchases."  Exhibit S, Credit Memo dated February 1, 2006.

cover the costs of construction of six saleable units.  The unit release fee was increased to the greater of $275,000 per unit or 90 percent of the sales price.  Additional collateral was also required.  The $900,000 loan closed on March 21, 2006, and the Modification Agreement for the initial loan was executed the same day.  The debtor guaranteed the new loan as well.  A new financial statement was not required.

Fitness Quest, LLC.  The debtor sought a second loan from the bank in December 2005 for Fitness Quest, LLC.[4] He gave the bank a personal financial statement dated December 31, 2005.  The bank issued a commitment letter on January 17, 2006.  The loan was to be used to refinance a fitness center in Fairfax County, Virginia.  The principal amount of the loan was $950,000 and was payable over five years.  Payments were based on a 10-year amortization schedule.  The debtor was required to give his unlimited guarantee for this loan as well.  The loan closed on January 26, 2006, and the debtor signed an unlimited guarantee.

### The Financial Statements

The debtor provided the bank with three personal financial statements.  They were dated May 31, 2005; December 31, 2005; and September 8, 2006.  All three were prepared by the debtor.  All are the same except for a few assets and fluctuations in valuations.  Each financial statement is four pages long.  Each page is captioned "Gerard R. Adam, II, Statement of Net Worth" and dated.

---

[4]The debtor's  May 31, 2005 financial statement states that the debtor was a one-third partner.  His December 31, 2005 financial statement states that he was the sole owner.  However, a December 24, 2005 e-mail from the debtor to Gloria Bragg, the loan officer responsible for the Fitness Quest loan, discusses another owner.  It states: "Okay – we FINALLY figured it ALL out, pending the banks approval . . . FITNESS QUEST Ownership to change effective Jan 1, 2006 - need to borrow $950,000 - with terms of 10 amortization, balloon in 5 and interest at 7 1/8% New ownership to be: René Adam 40% Triple Impact 60%".  Exhibit O at 4-5, 12.

The first page shows assets, liabilities, and net worth.  The following three pages contain 14 notes which detail each of the line items on the first page.

May 31, 2005 Financial Statement.  The May 31, 2005 financial statement shows total assets of $12,377,797; total liabilities of $3,845,833; and total net worth of $8,531,964.  The stated assets are:

| | |
|---|---|
| Cash | $85,000 |
| Receivables | $150,000 |
| Equities | $2,027,797 |
| Fixed Income | $1,500,000 |
| Closely Held Corporations | $2,075,000 |
| IRAs | $125,000 |
| Real Estate | $6,200,000 |
| Personal property | $215,000 |
| Other Assets | – |
| Total Assets | $12,377,797 |

The liabilities are "Mortgages" of $2,700,000 and "Other Debts" of $1,145,833.

Clodfelter testified that there were two significant aspects of the financial statements, equity and liquidity.  His internal report and evaluation of the prospective Adam Family Enterprises loan stated that the debtor "reported liquidity that consisted of [$85,000] in cash and $3.3 [million] in marketable securities."  Exhibit 1 at 2.  He also stated that he had received account statements "to back this up."  (These statements are Exhibit C.)  Clodfelter continued, "Rene [the debtor] shows a total net worth of $8.5 [million] and total outside net worth of $6.3 [million]."  He concluded, "With proper collateral and [the debtor's] guarantee, there is lower than normal financial risk for the bank."  Exhibit 1 at 2.

The debtor's liquidity was evidenced by "Equities" and "Fixed Income" on his financial statement.  Equities consisted of five holdings:

7

| Bessemer Trust | $1,122,797 |
| Charles Schwab | $55,000 |
| Chevy Chase Financial Services | $620,000 |
| Hedge Fund | $200,000 |
| Solomon, Smith Barney | $30,000 |

The Fixed Income asset was a second Bessemer Trust valued at $1,500,000.

The Equities and the Fixed Income asset, in addition to providing liquidity also provided a portion of the debtor's net worth. The balance of the debtor's net worth was in his real estate holdings and his business interests. Under "Real Estate," he listed his principal residence located in Oakton, Virginia, consisting of a house on five acres and an adjacent five-acre lot, and a second property in McHenry, Maryland. The primary residence and adjacent lot were valued at $3.5 million and $1.2 million, respectively; the McHenry, Maryland property, at $1.5 million. The financial statement listed mortgages of $1.7 million on the Oakton residence and $1 million on the McHenry, Maryland property.

The debtor listed five closely held businesses on his financial statement. Three contained the notation that he held a partnership interest, one of which stated that he was "one-half partner" and two that he was a "one-third partner." There was no such notation for Adam Family Enterprises or the fifth business. The financial statement also identified other debts for the three partnerships of which he was only a part owner. The financial statement lists only one-half or one-third of those debts, respectively.

December 31, 2005 Financial Statement. The second financial statement is dated December 31, 2005. It is in the same format as the May 31, 2005 financial statement. There are a few differences. It added a second house in Oakton, Virginia, valued at $1,250,000 with a mortgage of $995,000. There was a new mortgage listed for the five-acre parcel adjacent to the

Oakton primary residence with a new liability of $380,000.  The value of the Oakton residence was reduced to $3,200,000.

The December 31, 2005 statement contained no disclaimer that the debtor was a partner in Fitness Quest.  On the May 31, 2005 statement, he stated that he was a one-third partner and valued the ownership interest at $400,000.  The December 31, 2005 statement had no such disclaimer and the value was increased to $1,200,000.  He carried the debt for Fitness Quest in the same amount as in the first financial statement.

The December 31, 2005 financial statement showed an increased net asset value, $13,064,500; a larger liability, $5,190,833; and a smaller net worth, $7,873,667.

September 8, 2006 Financial Statement.  The September 8, 2006 financial statement was identical to the December 31, 2005 financial statement, including the date of December 31, 2005. It was initialed by the debtor.  The initials were dated September 8, 2006.

## **Inaccuracies in the Financial Statements**

The three financial statements were admittedly false.[5]  The bank requested personal financial statements from the debtor individually.  None of the $6.2 million of real estate listed on the May 31, 2005 financial statement was held in the debtor's individual name.  It was all held by the debtor and his wife as tenants by the entirety as was the second Oakton home added to the December 31, 2005 financial statement.

Clodfelter stated  in his report seeking loan approval of the first Adam Family Enterprises loan that the debtor had $3.7 million in marketable securities and $85,000 in cash.  This corresponds

---

[5]It is not clear whether the debtor simply admitted that the financial statements were false or admitted that they were materially false.  In any event, the evidence is clear that the financial statements were materially false.

with $3,527,797 of marketable securities ("Equities" and "Fixed Income") and $85,000 in cash listed on the May 31, 2005 financial statement. The cash entry was not challenged at trial. However, the ownership of the "Equities" and "Fixed Income" was not what it appeared. The financial statements represented that the equities were owned by the debtor individually. The two largest holdings were the Bessemer Trust accounts. Both were trust accounts managed by Bessemer Trust.[6] One was his wife's trust; the other was his. Mrs. Adam's trust had a value of $1,095,388. Mr. Adam's trust had a value of $1,230,140. The Chevy Chase account was a joint account.[7] It was in the name of the debtor and his wife. The portfolio value as of April 30, 2005, was $533,072.80. The Smith Barney account was in the debtor's own name and had a value of $29,169.62 as of February 27, 2005. There was no evidence presented on the Charles Schwab account or the Hedge Fund both of which the debtor listed in his financial statements with values of $55,000 and $200,000, respectively.

In addition to the problem with the ownership of the assets, the debtor omitted a $2.1 million loan from his financial statements. In Schedule D, "Creditors Holding Secured Claims", which he filed with the court, he scheduled Chevy Chase Bank, stating that the debt was incurred in 1999, that it was a joint obligation with his wife, and that it was secured by "All assets in Mary Adam Trust."[8]

---

[6]No evidence was presented as to the terms of the trusts including the beneficiaries and owners. The parties assumed that the trust's captions reflect the ownership of the trusts, that is, the "MJ Adam Rev Tr" is the wife's trust and the "GR Adam Rev Tr" is the debtor's trust. This is consistent with Schedule B of the debtor's schedules in this case. His wife's Bessemer Trust is not scheduled, indicating that it belongs to his wife and not to him. Exhibit 20.

[7]There is a question as to how the Chevy Chase account was held on May 31, 2005, the date of the financial statement. The Chevy Chase statement for the period ending April 30, 2005, is captioned "Rene Adam Mary Adam". Exhibit C. The statement for the same account for the period ending December 31, 2004, is captioned "Rene Adam Mary Adam/JTBE". Schedule B of the debtor's schedules in this case states the Chevy Chase Financial Services Investment Account had a value of $791,936 as of October 15, 2007, and was owned by the debtor and his wife as tenants by the entirety. It was claimed exempt on Schedule C as tenants by the entirety property. Exhibit 20.

[8]Schedule H, "Codebtors", is inconsistent with Schedule D. It does not list the debtor's wife as a codebtor. In addition to this obligation, she is also a joint obligor on the mortgages encumbering their home which are not listed on Schedule H. Schedule H is incomplete. No affected creditor is listed.

10

Exhibit 20.  This trust is the Bessemer Trust listed on the financial statement.  The omission is material.  Even if the debtor were not personally liable on the obligation, the existence of the lien on his wife's trust materially reduces its net value.  The net value of the debtor's marketable securities would be reduced by the lesser of the value of the trust or the obligation, at least 31%.  If the debtor is personally liable on the obligation, his net worth listed on the financial statement would be reduced by about 25%.[9]

The ownership of the closely held businesses are accurate, except for Ellicott City Fitness.  He listed interests in five closely held businesses and valued them at $2,075,000 on the May 31, 2005 financial statement.  Except for Ellicott City Fitness, which appears to have been held by the debtor and his wife as tenants by the entirety, the closely held businesses were held by the debtor in his individual capacity.

## Publication With Intent to Deceive

The debtor admits the obvious:  all three financial statements were false.  The evidence is clear that they were materially false.  He asserts, however, that he did not provide the financial statements to the bank with the intent to deceive the bank.  He asserts that he did not understand the difference between owning assets individually and owning them with his wife as tenants by the entirety.  He asserts that he simply listed everything in which he had an interest.  He asserts that because he did not understand the nature of tenancies by the entirety, he did not believe that he needed to disclose the nature of the ownership or his wife's interest in the assets.

---

[9]The calculations assume that the outstanding balance of the Chevy Chase loan was $2.1 million on May 31, 2005, the date of the financial statement.  The debtor gave that balance as of October 15, 2007, the date he signed Schedule D under penalty of perjury.

At his deposition, he was asked about tenants by the entirety.  He claimed to have only a vague understanding of the term.

Q:      Do you know what tenants by the entirety is?
A:      No sir.
Q:      I beg your pardon?
A:      No.
Q:      You don't know what tenants by the entirety is?
A:      No.
Q:      You've never heard that term?
A:      Oh, I have heard the term.  I don't know all that it entails.
Q:      I thought you testified earlier that you changed your interest in ECF [Elliott City Fitness] from your ownership to tenants by the entirety with your wife; is that what you told me?
A:      Yes it is.
Q:      You changed it to tenants by the entirety, but you didn't understand what that meant.
A:      Again, I, my estate planning attorney advised me that I should have ownership in certain things tenants by the entirety.
Q:      Did you ask him what tenants by the entirety meant?
A:      Yes.
Q:      And what is your understanding of tenants by the entirety?
A:      It is just, it's my understanding it's a way for a couple to own something that is I guess protected or, secure because my wife and I had no income, jobs, actually.

Exhibit 22, Deposition of Gerard Rene Adam, II, June 24, 2008 at 18-20.

In short, the debtor sought to portray himself as naive, inexperienced, and uninformed.  The evidence is to the contrary.

Education and Professional Background.  The debtor graduated from the University of New Orleans with a bachelor of science degree in accounting in 1976.  He was a certified public accountant and worked at Ernst & Ernst for two years where he audited healthcare companies and hospitals.  He continued to work in accounting after leaving Ernst & Ernst and before becoming a consultant for hospitals in 1980.  He continued as a hospital consultant until 1988 when he began working for Financial Dynamics, a privately held technology company.  He worked there until 1997

12

at which time he was the chief operating officer. The company was sold in 1997.  The debtor

claimed he could not remember the amount he received for his interest in Financial Dynamics but

that it exceeded $9 million.  After 1997 he invested in and started numerous small businesses.  In

some, he assisted others in starting the businesses.  He retained an equity ownership in anticipation

of the businesses becoming successful and the operating owner buying him out.  It is not clear how

many businesses he organized or was involved in, but they included a pizza restaurant, two fitness

clubs, and a woodworking company.  He also started or purchased other businesses himself and

operated them.  They include a car dealership and Adam Family Enterprises, a real estate

development company.  Seven companies are listed in response to Question 18 in the Statement of

Financial Affairs of which all but two were operating when he filed his bankruptcy petition.

The debtor had no salaried income when he filed bankruptcy or during the two years

preceding the filing.  He reported his sole income as $25,000 a month coming from either his wife's

trust or a joint trust.  His wife had never been employed outside the home except as a part-time clerk

in a Hallmark store.  There is no indication that either the debtor or his spouse had any significant

net worth at the time they were married or that either received any significant inheritance.

Substantially all of their assets appear to have come from the sale of the debtor's interest in

Financial Dynamics in 1997.  The debtor's spouse did not own an interest in Financial Dynamics.


Legal Representation and Financial Structure.  The debtor retained the law firm of Paley,

Rothman, Goldstein, Rosenberg, Eig, and Cooper in 1997.  Craig M. Palik of McNamee, Hosea,

Jernigan, Kim, Greenan & Walker, P.A., who is debtor's co-counsel with Paley Rothman in this

case, stated in his Rule 2016 statement that the debtor had been a "client of Paley Rothman for

approximately ten years" and that in March of 2007, "Paley Rothman began performing legal services for the Debtor regarding the rehabilitation and reorganization of his personal financial affairs."

The debtor stated in response to Question 10b of the Statement of Financial Affairs, "On November 10, 1997, the Debtor and his non-debtor wife executed various estate planning documents prepared for them by Frederick J. Tansill, Esquire including wills and revocable trusts." The bank asked the debtor in an interrogatory to identify each trust created by him or his wife within the last ten years and to identify the source of funds deposited. He identified eight trusts and accounts. He attached a summary showing the transfers between them. The answer shows a sophisticated financial structure. The debtor opened an account jointly with his wife as tenants by the entirety in December 1999 (Account 8G3534). It was funded on December 30, 1999, with $1,037,828.88 in cash and securities. At the same time, two additional trusts were established, one for the debtor and one for his spouse, the "Rene Adam Revocable Trust" (Account 8G3588) and the "Mary Adam Revocable Trust" (Account 8G3587), respectively. The Rene Adam Revocable Trust was funded in October 2001 with $100,000 from the tenants by the entirety account (Account 8G3534). It was pledged as collateral for a loan from Century National Bank/United Bank. When the loan was paid in February 2004, the debtor and his spouse began taking $10,000 monthly distributions from the account. It was depleted by October 2004 and closed in August 2005. The Mary Adam Revocable Trust is still open and funded.

In May 2003, the debtor and his spouse established two additional trusts, the "M.J. Adam Revocable Trust u/a dated 4/20/2002" (Account 8G4783) and the "G.R. Adam Revocable Trust u/a dated 4/2002" (Account 8G4782). These two trusts were funded by splitting the tenants by the

entirety account  (Account 8G3534).  The M.J. Adam Revocable Trust (Account 8G4783) received

$990,464 on May 27, 2003.  The G.R. Adam Revocable Trust (Account 8G4782)  received a total

of $1,436,722.12, principally on May 27, 2003.  The tenants by the entirety account (Account

8G3534) was closed in September 2003.  In April 2006, a new tenants by the entirety account was

opened.  It was titled "Gerald R. and Mary J. Adam JTBE" (Account 8G7357).  It received

$1,401,293.23 in cash and securities, the remaining balance in the G.R. Adam Revocable Trust

(Account 8G4782)  which was closed in January 2007.  The transfers from the G.R. Adam

Revocable Trust (Account 8G4782) to the Gerald R. and Mary J. Adam JTBE account (Account

8G7357) began on April 24, 2006, and ended on August 30, 2006.[10]  The new joint account is open

and funded.

In each instance of a new trust or account, securities and cash were transferred from an

existing trust or account to the new trust or account.

The debtor first consulted with his estate planning attorney, Frederick J. Tansill, in 1997.

He testified at his deposition that "We [Tansill and the debtor] periodically met to discuss my estate

and our trusts and he would occasionally have us restructure our holdings."  Exhibit 22, Dep. at 22.

In early 2006, he transferred his individual ownership of a fitness club, ECF, LLC, (apparently

---

[10]The following amounts were transferred:

| Date | Securities | Cash | Total |
|------|-----------|------|-------|
| 4/24/2006 | $346,451.97 | — | $346,451.97 |
| 4/25/2006 | $170,550.98 | — | $170,550.98 |
| 5/3/2006 | — | $10,485.37 | $10,485.37 |
| 7/14/2006 | $587,079.27 | — | $587,079.27 |
| 7/19/2006 | $264,729.10 | — | $264,729.10 |
| 7/25/2006 | — | $21,814.73 | $21,814.73 |
| 8/30/2006 | — | $181.81 | $181.81 |

Ellicott City Fitness) to himself and his wife as tenants by the entirety. Neither he nor his wife were employed at the time, but they were receiving income of $25,000 a month from the Mary Adam Revocable Trust. Statement of Financial Affairs, Question 2.      The debtor's transfer of his ownership in ECF, LLC, the establishment of the new tenants by the entirety account, and the transfer of cash and securities from his individual account to the new tenants by the entirety account occurred shortly after the bank modified the first loan to Adam Family Enterprises and made the second loan to Fitness Quest. The first loan made by the bank closed on July 21, 2005. The first indication to the bank of any difficulty was not until the winter of 2006 when the bank insisted that the loan be restructured. However, the debtor knew in July 2005 when the loan closed that the payoff to the old lender was larger than anticipated and that loan funds intended for interest carry and infrastructure were prematurely depleted. The restructured loan closed on March 21, 2006. The assets, both securities and cash, in the G.R. Adam Revocable Trust (Account 8G4782) were transferred to the Gerard R. and Mary J. Adam JTBE account (Account 8G7357) held as tenants by the entirety starting on April 24, 2006. On April 24 and 25, 2006, $517,002.95 was transferred from the debtor's individual trust to the tenants by the entirety checking account (Account 8G7357). From July 14 to July 25, 2006, an additional $873,623.10 in cash and securities was transferred from the individual trust to the tenants by the entirety account.

     Account Statements.  Both the bank and the debtor introduced into evidence statements of the Chevy Chase Financial Services account. The bank introduced the statement for the period ending December 31, 2004, which showed a balance of $618,293.25. (Exhibit 2). This was obtained from the debtor in discovery. The account name is "Rene Adam Mary Adam/JTBE." The debtor introduced the statement for the period ending April 30, 2005, which showed a balance of

$533,072.80. (Exhibit C). It shows the account in the name of "Rene Adam Mary Adam." This account statement was obtained from the bank in discovery and was the one the debtor gave to the bank by the debtor to support his May 31, 2005 financial statement.[11]   The debtor's Amended Schedule B to his bankruptcy filing lists the Chevy Chase Financial Services account with a value of $791,936 and states that it is held by the debtor and his wife as tenants by the entirety. The debtor claimed it exempt as tenants by the entirety property.

Similarly, there are two statements for the Solomon Smith Barney account which was listed on the May 31, 2005 financial statement. (Exhibits 3 and C). Both statements contain the same account number. Exhibit 3 was provided to the bank by the debtor in response to a request for production of documents. It is for the period ending December 31, 2004. The ending balance is the same as the beginning balance on Exhibit C. The debtor gave the bank Exhibit C in support of his loan application on June 7, 2005.[12] Exhibit 3, the statement for the period ending December 31, 2004, showed the ownership as "Rene Adam and Mary Adam, JTBE." Exhibit C, the statement submitted to the bank in support of the loan application and for the period from January 1, 2005 to February 27, 2005, showed the account solely in the name of Rene Adam.

The bank received two statements of the Bessemer Trust. One is for the "M J Adam Revocable Trust u/a dated 4/02" (Account 8G4783). It showed as of April 30, 2005, a balance of $1,095,388. The second Bessemer Trust statement also dated April 30, 2005, was in the name of "G R Adam Revocable Trust u/a dated 4/02" (Account 8G4782). It showed a balance of

---

[11]Exhibit C contains a facsimile header showing that it originated from Adam Family on June 7, 2005. Exhibit E, Clodfelter's recommendation dated June 9, 2005, shows a telephone call from Clodfelter to the debtor on June 3, 2005, requesting statements from the trust and brokerage accounts.

[12] As with the Chevy Chase statement, it also had a facsimile header.

17

$1,230,083.  Both show a relatively stable balance from June 1, 2003 to the date of the statement.

The transfers shown on the Bessemer statements are consistent with the answer to interrogatories

showing the transfer from the Gerard R. and Mary J. Adam tenants by the entirety account (Account

8G3534) to the two individual revocable trusts.  Mrs. Adam's Bessemer Trust (Account 8G4783)

is listed as an asset on the May 31, 2005 financial statement, notwithstanding that the debtor had no

interest in it.  It is not scheduled on the debtor's bankruptcy schedules which is consistent with the

debtor having no interest in the account.

Discussion.  The picture that the debtor draws of himself as a simple businessman,

unsophisticated in financial affairs and with only a vague understanding of the meaning of tenants

by the entirety, cannot be credited.  He was the chief operating officer of a very successful

technology company, a position which resulted in a multimillion dollar payment to him when the

company was sold in 1997.  He immediately sought advise of counsel for what he describes as

estate planning purposes.  The estate planning suggested by the evidence is not the typical plan one

makes to provide for heirs upon  death but one to protect assets for one's own benefit during one's

lifetime.[13]  The debtor's wife did not have an interest in Financial Dynamics.  Upon the sale of

---

[13]Estate planning to minimize federal estate taxes for large estates typically, but not universally, seeks to avoid
having all of the party's assets inherited by the surviving spouse.  The typical estate plan severs the right of survivorship
of jointly held assets so that they will not automatically pass to the survivor upon death of the first joint owner.  If they
all pass to the survivor, the survivor may have a very large estate upon which estate taxes will be paid.  Estate taxes will
be substantially reduced if the surviving spouse has outright ownership of only one-half of the estate and the other half
is held in trust for the current benefit of the surviving spouse and with the remainder to the children.  Care needs to be
taken and there are many considerations in establishing an estate plan to minimize estate taxes, but the circumstances
in this case indicate that the estate plan was not to minimize estate taxes but to minimize exposure to creditors.  To
minimize exposure to creditors it is necessary to place the maximum amount of  assets in tenants by the entirety property
and to insure that there are no joint debts.  Tenants by the entirety property is not subject to the individual debts of either
spouse.  *Hausman v. Hausman,* 233 Va. 1, 353 S.E.2d 710, 711 (1987)*; Vasilion v. Vasilion,* 192 Va. 735, 66 S.E.2d
599, 602 (1951); *Bunker v. Peyton (In re Bunker)* 312 F.3d 145 (4th Cir. 2002);  *Williams v. Peyton  (In re Williams)* 104
F.3d 688 (4th Cir. 1997).

There is nothing inherently improper  with planning financial affairs so that financial assets are protected from
creditors any more than there is anything inherently improper  in planning financial transactions so as to minimize taxes.
(continued...)

Financial Dynamics, the proceeds were placed in tenants by the entirety accounts to protect them from individual creditors.

A telling example of the debtor's understanding of tenants by the entirety accounts is his movements of funds between tenants by the entirety accounts and individual accounts. The debtor and his wife originally established Gerald R. and Mary J. Adam joint checking account which was held as tenants by the entirety (Account 8G3534). It was immune from individual creditor's claims. The account was split into two individual revocable trusts, neither of which was protected from individual creditors. However, when financial problems appeared on the horizon, the debtor voluntarily transferred the assets of his individual trust to a new tenants by the entirety trust.[14] The change in the manner in which the account was titled first from tenants by the entirety to an

---

[13](...continued)
Justice Frankfurter stated for the Supreme Court:

> As to the astuteness of taxpayers in ordering their affairs so as to minimize taxes we have said that 'the very meaning of a line in the law is that you intentionally may go as close to it as you can if you do not pass it.' *Superior Oil Co. v. State of Mississippi,* 280 U.S. 390, 395, 396, 50 S.Ct. 169, 170, 74 L.Ed. 504. This is so because 'nobody owes any public duty to pay more than the law demands: taxes are enforced exactions, not voluntary contributions' Learned Hand, C.J., dissenting in *Commissioner of Internal Revenue v. Newman,* 2 Cir., 159 F.2d 848, 851. Conversely, the State, insofar as it may limit its basic power to tax to enable government to go on, can sail as closely as astuteness permits to the line of an immunity from such exaction.

*Atlantic Coast Line R. Co. v. Phillips,* 332 U.S. 168, 172-173, 67 S.Ct. 1584, 1587 (1947).

Of course, passing over the line may change tax planning to tax evasion just as passing over the line may change asset protection to fraud. In this case, the fraud was not in endeavoring to protect assets, but in misrepresenting them to the bank.

[14]In addition to showing the debtor's understanding of tenants by the entirety accounts, the transaction has badges of fraud indicating a fraudulent or voluntary conveyance avoidable under §§55-80 and 81 of the Code of Virginia.

19

individual trust and then back to tenants by the entirety account shows that the debtor knew the significance of a tenants by the entirety account.[15]

Another example of the debtor's understanding of tenants by the entirety accounts was the October 2001 loan from Century National Bank/United Bank.  The bank required collateral.  Rather than pledging the tenants by the entirety account, funds were placed in an individual account, the Rene Adam Revocable Trust (Account 8G3588).  When the pledge was satisfied, the debtor had the choice of funding his monthly living expenses from the protected tenants by the entirety account or from the unprotected individual collateral account.  He chose to spend the unprotected money in the individual account and did so at the rate of about $10,000 a month until the account was exhausted.

There is additional evidence that belies the debtor's argument.  First, he prepared a financial statement dated August 15, 2003, which was in the same format as the three submitted to the bank. However, this financial statement was a joint statement with his wife which he and his wife both signed.  It scheduled substantially the same assets as those scheduled on the three financial statements given to the bank.

Second, all four financial statements, the three given to the bank and the August 15, 2003 statement, reflect that the debtor knew that he could not list an asset in which he had only a partial

---

[15]There is a  discrepancy between the account statements in that they do not consistently report the ownership of the account.  The December 2004 statement has the notation "JTBE" meaning "joint tenants by the entirety" while the April 30, 2005 statement does not contain that notation.   There are three principal explanations for such a discrepancy. It may be a bank error.  The account may always have been a tenants by the entirety account and there was a bank error in printing the copy he faxed to the bank.  While possible, that is not likely.  The second explanation is that the debtor changed the account from a tenants by the entirety account to a non-tenants by entirety account and later changed it back.  This is more likely than a bank error, although in many instances, financial institutions require that such a change be accomplished by closing the old account and opening a new account for which the account number would change. In this instance, the account number did not change.  The third potential explanation is that the debtor concealed the "JTBE" on the copy he faxed to the bank.  It is not necessary for the court to resolve this discrepancy, only to note that the likelihood of a bank printing error is the least likely of the three.  The other two require an affirmative action on the part of the debtor, either of which clearly indicates the debtor's knowledge of the significance of a tenants by the entirety account.

interest unless he also disclosed his partial interest.  On the May 31, 2005 statement, he listed two

closely held businesses with the disclaimer "one-third partner."  Three businesses were listed that

indicated his partial interest.  On all four financial statements, he listed a closely held business, Deep

Creek Investments, and then stated that he was a "one-half partner."   Similarly, on all four

statements, he listed Ellicott City Fitness as a closely held business and stated that he was a "one-

third partner."  A third business, Fitness Quest, was also scheduled as a closely held business.  On

the August 15, 2003 statement and May 31, 2005 statement, he stated that he was a "one-third

partner" and valued the interest at $350,000 and $400,000, respectively.   However, on the

December 31, 2005 statement, which he reaffirmed on September 8, 2006, he dropped the disclaimer

of a one-third ownership interest and tripled the value from $400,000 to $1,200,000 as reflected on

the May 31, 2005 statement.

Even if the debtor did not fully understand the significance of tenancy by the entirety, he

knew he only had a partial interest in the tenancy by the entirety property and that he had to disclose

this fact just as he did for the three closely held businesses.  Even if the debtor did not wholly

understand the specific legal implications of holding assets as tenants by the entirety, he understood

that on a personal financial statement jointly owned property should be, at best, included only to the

extent of his interest and that there should be a disclaimer as to his interest.  His experience as an

accountant re-enforces his knowledge of the significance of disclaimers.

Other evidence that belies his argument was his unsuccessful attempt to convince the bank

to accept a short payoff  for the sale of two units at Deep Creek.  In presenting this evidence at trial,

the debtor thought he was showing his good faith efforts to minimize the bank's loss.  He obtained

two contracts to sell units, but, as the real estate market cooled, they were for less than the unit

21

release fee.  Each sale was short about $10,000.  He says that the bank could have mitigated its loss by accepting the short payoffs.  While true, the bank was fully justified in refusing to accept a short payoff.  It relied on his financial statements which showed that he had a net worth of $8.5 million, most of which was in liquid securities or cash.  In these circumstances, there was no reason why the bank should accept a short payoff.  If the financial statements had been accurate, the debtor obviously had sufficient liquid assets to write a check for the small difference between the lot release price and the net proceeds from the closing.  In fact, it would have been in the debtor's best interest to have done so if he thought that he would have to honor his unlimited personal guarantee.  By rejecting the sales contract at a time when the booming real estate market was cooling, he ran the risk of a less advantageous sale later and faced the certainty of paying additional carrying costs until there was another sale.  In these circumstances, the bank believed he was in a position to write the check and pay the full release fee.  His refusal to do so makes sense only if he did not intend to honor his guarantee and believed he would not have to do so, that is, his assets were beyond the bank's reach.

Conclusion.  Considering the debtor's education, that he was a certified public accountant, that he was  chief operating officer of a very successful technology company, that he organized and operated multiple small businesses after he cashed out from Financial Dynamics, that he was throughout the entire period represented by counsel, and that he continually sought and received advise from counsel on how to own and transfer assets, there is no doubt that the debtor knew exactly what a tenants by the entirety property meant and had long been manipulating his property to minimize his exposure to his creditors.  The debtor's argument that he was a simple,

unsophisticated, and inexperienced individual, ignorant to the meaning of tenants by the entirety, is belied by his sophistication, experience, conduct, and constant reliance on counsel.

The debtor presented his financial statements to the bank with full knowledge that they were materially false and with the intent to deceive the bank. He intended to induce the bank to make loans to his solely owned companies based on his ostensive net worth. He freely gave the required unlimited guarantees but never intended to honor them. While he did not expect a loss from the transactions – he entered into the Adam Family Enterprises transaction when the real estate market was booming – he intended, if push came to shove, not to honor the guarantee upon which the bank relied.

## **Reasonable Reliance**

The bank must have reasonably relied on the false financial statements in order for the obligations to be nondischargeable. A creditor does not reasonably rely on a false financial statement when it possesses information that shows that the statement is materially false or that raises red flags. *Avco Fin. Serv., Inc. v. Abdul'Faruq (In re Abdul'Faruq),* 175 B.R. 618 (Bankr.E.D.Va.1994). In this instance, the bank did not reasonably rely on the admittedly false financial statements.

Three of the account statements raised red flags that the bank should have further investigated. The Bessemer Trust statement dated April 30, 2005, was in the name of "M J Adam Revocable Trust, u/a dated 4/2002" (Account 8G4783). The trust account, standing in Mrs. Adam's name, was on its face clearly not an asset in which the debtor had an interest. The bank should have inquired further. The value of the account as of April 30, 2005, was $1,095,388.

The Chevy Chase financial statement dated August 30, 2005, was clearly a joint account, a fact not disclosed on the financial statement.  The bank should have inquired further.  The balance as of April 30, 2005, was $533,072.80.

The second Bessemer Trust account was in the name of "G R Adam Revocable Trust, u/a dated 4/2002" (Account 8G4782).  The account was not in the debtor's name, but was a trust.  Without looking further, the bank could not know what recourse it had with respect to the account.  Again, the bank should have inquired further.  The account had a balance of $1,230,140 as of April 30, 2005.

The bank unsuccessfully tried to show that these accounts were not important to the loan approval process, arguing that it relied on the real estate.  Clodfelter testified that the Adam Family Enterprises loan would have been made even if the bank had recognized that one of the Bessemer Trusts was in Mrs. Adam's name, not the debtor's name.  The thrust of the testimony was that the bank reasonably relied on the balance of the information, not on Mrs. Adam's Bessemer Trust account.

This argument is contradicted by the bank's actions and its internal working papers.  Clodfelter called the debtor on June 3, 2005, and requested the trust and brokerage account statements.  Exhibit 1.  The statements were important enough for him to request.  He looked at them.  He included them in his evaluation.  In his June 9, 2005 report titled "Commercial Banking Client Profile", he stated that the debtor's net worth was $8.5 million which necessarily includes Mrs. Adam's Bessemer Trust.  Exhibit 1.  Under the section titled "Financial Risks and Analysis," Coldfelter stated, "On 5/31/2005 Rene reported liquidity that consisted of [$85,000] in cash and $3.5 [million] in marketable securities.  I received account statements to back this up."  Later, under the

section titled "Strengths and Weakness of the Client," he stated, among other strengths, "Liquidity."

Again, in a memorandum to Todd Hannah who had to approve the initial loan, Clodfelter repeated

the statement that the debtor "reported liquidity that consisted of [$85,000] in cash and $3.5

[million] in marketable securities. I received account statements to back this up." Exhibit 21. The

three questionable accounts potentially reduce the debtor's individual net worth from $8.5 million

to about $5.6 million. More importantly, they reduce the debtor's liquid net worth from $3,652,797

to $795,254.

The bank in fact relied on the debtor's liquidity when it made the initial loan. It expressly

relied on it when it restructured the loan. The Commitment Letter for the initial loan, dated June 9,

2005 (Exhibit 6), contained one covenant in paragraph 24. It provided that the Cedar Creek property

not be further encumbered. The February 14, 2006 Commitment Letter contained three covenants

in paragraph 26. One required that "René Adam must maintain $2,000,000 of unpledged liquidity

at all times." Exhibit 13. Unbeknownst to the bank, the debtor was never in compliance with this

covenant.

The bank's principal argument at trial was that it relied on the debtor's real estate, not the

debtor's liquidity. The real property was owned as tenants by the entirety, not individually, and was

thus misrepresented.[16] The bank had no reason to question the entry and reasonably relied on what

the debtor stated.[17] *See Mester v. Brevard (In re Brevard),* 200 B.R. 836, 845 (Bankr.E.D.Va. 1996)

---

[16]The real estate was valued at $6.2 million on the May 31, 2005 financial statement. Including the real estate on the financial statement without noting how it was held or even that the debtor only held a one-half interest was itself sufficient to render the financial statement materially false.

[17]The debtor sought to show that the bank should have known that the real property was held as tenants by the entirety even though not disclosed on the financial statement. He points to a personal cash flow analysis prepared by an analyst at the bank. Through this, he was able to show that the analyst reviewed both the debtor and his spouse's credit reports. If the analyst had examined the two credit reports closely, the debtor contends, he would have had

(continued...)

25

("[T]here is no affirmative requirement that a creditor verify from external sources the information on a financial statement.")  However, the debtor's liquidity – which was falsely represented to the bank – was a material factor in granting the Adam Family Enterprises loan.  While the bank would now like to say that it did not rely on the liquidity analysis, the loan would have been approved without the debtor's ostensive liquidity.

The bank may not pick and choose among the false statements to prove its debts nondischargeable: here, discarding those upon which it could not reasonably rely; there, retaining those upon which it could reasonably rely.  In fact, both aspects of the debtor's ostensive financial condition were relied on by the bank.  After discussing the debtor's liquidity and overall net worth, Clodfelter concluded, "With proper collateral and Rene's guarantee, there is lower than normal financial risk for the bank."  Ex. 1 at 2.

There were likely additional benefits in following up on the red flags.  The loan application would have begun to unravel.  The true ownership of the accounts – and probably the real estate – would likely have been discovered.[18]  The bank would have found that the debtor's individual net

---

[17](...continued)
questions as to the real estate debt.  It would have shown up as the debt of both parties.  The debtor concludes that there was then a red flag suggesting the property was held as tenants by the entirety.  The difficulty with this is that while it does tie in the two credit bureau reports and show that both were obtained by the bank, both loan officers testified that they did not review or rely upon the wife's credit report.  There was no testimony as to what the analyst was suppose to do, or, in fact, did.  There is no indication that standard practice in the industry required the bank to make the analysis that the debtor would now like the bank to have made.  It appears from the evidence rather that the analyst merely entered information from various sources to create a cash flow analysis and a pro forma personal financial statement, both of which were put in a standard form for evaluation by the bank.  The pro forma personal financial statement created by the analyst is drawn almost exclusively from the personal financial statement provided by the debtor and includes the wife's separate trusts.  There is no evidence that any greater analysis was performed or should have been performed.  The analyst was not called as a witness at trial.

[18]Clodfelter testified that title examinations are not required because they take time and cost money.  They would make the bank uncompetitive.  In fact, title examinations are relatively cheap and can be obtained in a matter of days.  But even without a title examination, there was little cost in requiring the debtor to provide copies of the deeds to his property, just as he was required to provide copies of his brokerage statements and account statements.  In this case, the debtor's principal residence is situated in Fairfax County, Virginia.  The Department of Tax Administration

(continued...)

worth was substantially less than stated and substantially less liquid.  The bank  would have found

that the debtor's conduct raised questions about his credibility.  The bank would not have made the

loan.

The debtor admitted that the financial statements he gave to the bank that were used to

induce the bank to make a loan to him were false.  That is not sufficient for a nondischargeability

judgment.  The bank must reasonably rely on the false financial statement.  In this case, it did not.


## Willful and Malicious Injury

The bank argued in the alternative that the debts should be determined nondischargeable

because the debtor by presenting an admittedly false financial statement willfully intended to harm

the bank.  The law does not support the bank's proposition.  Section 523(a)(6) is a broad provision

of the Bankruptcy Code.  Section 523(a)(2)(B) is narrow and specifically deals with false financial

statements.  If the bank's argument were correct – that the debtor is guilty of a willful and malicious

injury to the bank by submitting a false financial statement –  then the bank avoids the necessity of

proving that it reasonably relied upon the false financial statement.  No creditor would proceed

under §523(a)(2)(B) where it must prove reasonable reliance when by proceeding under §523(a)(6)

it would prevail merely by showing falsity.  The more general statute would consume the more

specific rendering the more specific of no purpose.  *Morales v. Trans World Airlines, Inc.,* 504 U.S.

374, 384-385, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (specific controls over general); *Berkson v.*

---

[18](...continued)
maintains a public website that provides basic information on all real estate in Fairfax County, specifically including the
names of the current owners.  A search takes only a moment.  In this case, the bank reasonably relied on the debtor's
financial statement  as to his ownership interest in the real estate.  No red flags were raised.  It was not required to verify
the information provided by the debtor by searching Fairfax County's real estate tax website.  However, it does suggest
that the bank's rationalization that it cannot economically and speedily verify basic information is outdated.

*Gulevsky (In re Gulevsky)*, 362 F.3d 961, 964 (7th Cir. 2004) (oral misrepresentation of financial condition); *McCrary v. Barrack (In re Barrack),* 217 B.R. 598 (9th Cir.BAP 1998) (oral misrepresentation of financial condition).

*Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) is most closely on point. There the Supreme Court declined to read 11 U.S.C. §523(a)(6) broadly, in part because it would render §523(a)(9) and §523(a)(12) unnecessary. Those section would be within the proposed broad construction of §523(a)(6). The same would result with §523(a)(2).

## Conclusion

The financial statements that the debtor submitted to the bank were knowingly materially false and submitted to the bank with the intention to deceive it. However, the bank did not reasonably rely upon them. The debts will be discharged.

Alexandria, Virginia
January 29, 2009

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

Copy electronically to:

Matthew Marc Moore
Craig M. Palik
U.S. Trustee
Richard A. Bartl

14717

28